UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 OCT 17 PM 12: 25

BY _____
DEPUTY CLERK

HENRY MOOERS, on behalf of himself and )
all others similarly situated,            )
                                          )
        Plaintiff,                        )
                                          )
            v.                            )      Case No. 2:20-cv-00144
                                          )
MIDDLEBURY COLLEGE,                       )
                                          )
        Defendant.                        )

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT & DENYING AS MOOT DEFENDANT'S
MOTION TO STRIKE JURY DEMAND**
(Doc. 94)

Plaintiff Henry Mooers ("Plaintiff") brings this putative class action against

Defendant Middlebury College ("Middlebury") alleging breach of contract and unjust

enrichment stemming from Middlebury's tuition and fee policy during the spring 2020

semester in which Middlebury moved to online classes due to the COVID-19 pandemic.

Plaintiff seeks compensatory damages, a disgorgement of "ill-gotten gains," and

restitution, as well as attorneys' fees and costs. (Doc. 57 at 25.)

On December 22, 2023, Middlebury moved for summary judgment and to strike

Plaintiff's jury demand. (Doc. 94.) Plaintiff filed an opposition on March 1, 2024. (Doc.

101). Middlebury filed a reply on April 5, 2024, (Docs. 104, 105), and three notices of

supplemental authority on April 15, 2024, June 8, 2024, and August 13, 2024,

respectively. (Docs. 106, 116, 118.)  The court heard oral arguments on May 9, 2024, at

which point the court took the present motion under advisement.

Plaintiff is represented by Michael A. Tompkins, Esq., Jeremy B. Francis, Esq.,

and Tristan C. Larson, Esq. Middlebury is represented by Jeffrey J. Nolan, Esq., Paul G.

Lannon, Jr., Esq., Sheila Shen, Esq., Kathryn J. Richards, Esq., Lindsay A. Enriquez,

Esq., and Robert J. Burns, Esq.

**I.      Whether Plaintiff's Opposition Complies with Fed. R. Civ. P. 56(c) and D. Vt. R. 56(c).**

Middlebury argues that Plaintiff's Statement of Disputed Facts in Opposition to Defendant's Motion for Summary Judgment ("SDMF") is improper and noncompliant with the relevant Federal Rules of Civil Procedure and this court's Local Rules insofar as it fails to respond directly to each of Middlebury's undisputed facts. The court agrees.

"Local Rule 56(c) mandates that statements of disputed facts 'be supported as required by Fed. R. Civ. P. 56(c),' which in turn obligates a party to cite 'to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *Du Grenier v. Encompass Ins. Co.*, 2017 WL 9472173, at *5 (D. Vt. Dec. 28, 2017) (alterations adopted) (citing Fed. R. Civ. P. 56(c)). "Pursuant to Fed. R. Civ. P. 56(e)(2), all material facts in the movant's statement of undisputed facts are deemed to be admitted unless controverted by the opposing party's properly supported statement." *Id.*

In a section of Plaintiff's SDMF, titled "Purported 'Undisputed Material Facts' as Asserted by Defendant That are Expressly Challenged by Plaintiff as Inaccurate[,]" Plaintiff fails to respond to Middlebury's Statement of Undisputed Material Facts ("SUMF") but, rather includes six paragraphs followed by a section titled "Disputed Material Facts Relating to Defendant's Motion for Summary Judgment" that contain additional facts in paragraphs 7 to 42, some of which are not disputed, including facts about Plaintiff and his payments to Middlebury.

In its reply, Middlebury ties Plaintiff's responses or lack of responses to its own SUMF. The court relies on this composite SUMF to determine which facts are contested.

In the District of Vermont, "the Local Rules do not provide an opportunity for the nonmoving party to file a statement of *undisputed* facts at the summary judgment stage." *Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 276 (D. Vt. 2013) (emphasis in original) (citing *Schroeder v. Makita Corp.*, 2006 WL 335680, at *3 (D. Vt. Feb. 13,

2

2006)). The court, however, will consider any additional facts that are material and either undisputed or identify a genuine issue of material fact which Middlebury has not addressed. *See id.* (citing *Post v. Killington Ltd.*, 2010 WL 3323659, at *1 n.1 (D. Vt. May 17, 2010)).

## II.    Undisputed Facts.

### A.    The Parties.

Plaintiff attended Middlebury, a nonprofit higher education institution located in Middlebury, Vermont, for four years and graduated *magna cum laude* with a Bachelor of Science in computer science following the spring 2021 semester. Upon graduating, Plaintiff obtained employment as an analyst at an investment management firm.

### B.    Middlebury's Response to the COVID-19 Pandemic.

On March 10, 2020, Middlebury announced that, due to the COVID-19 pandemic, spring break would begin a week earlier than scheduled to allow students and faculty to prepare for the transition to online learning. From March 13, 2024, to March 20, 2020, (the "Lost Week"), Middlebury ceased providing its students with instruction and other on-campus educational services, as well as access to its campus and activities.

On March 13, 2020, the Governor of Vermont issued an Executive Order prohibiting all non-essential gatherings of more than 250 people. On March 24, 2020, the Governor issued a stay-at-home order directing all not-for-profit entities to suspend in-person operations.[1] Pursuant to the Executive Order, higher education institutions were allowed to maintain in-person operations only as they pertained to critical infrastructure and staffing. Classes and student services were required to be held remotely.

---

[1] "A court may properly take judicial notice of a document when the document is publicly available and its accuracy cannot reasonably be questioned." *Picket Fence Preview, Inc. v. Zillow, Inc.*, 623 F. Supp. 3d 371, 380 (D. Vt. 2022) (quoting *Apotex Inc v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016)) (citing Fed. R. Evid. 201(b)) (internal quotation marks and alterations omitted). "A court may take routine judicial notice of documents retrieved from official government websites." *Vill. Green At Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022) (internal quotation marks, alterations, and citations omitted). The court takes judicial notice of the March 13, 2024 and March 24, 2024 Executive Orders. *See* Fed. R. Evid. 201.

3

To ensure all of its students were able to return home, Middlebury provided assistance in the form of housing and travel stipends for students studying abroad. For those who could not return home, Middlebury continued to provide housing and meals. These students were not eligible for room and board refunds. For all other students, Middlebury refunded more than $9 million in room and board fees. Plaintiff received a prorated refund of $3,207.

Middlebury created a Digital Learning & Inquiry ("DLINQ") team to assist with the transition to online learning by providing training and resources. As part of the transition, Middlebury acquired Zoom licenses, modems, high-speed internet services, and equipment for students and staff. Apart from access to DLINQ, Middlebury provided students with remote tutoring, remote physical and mental healthcare, library services, and career development services throughout the period of remote learning. Providing this support and services resulted in unbudgeted costs, which Middlebury met by increasing withdrawals from its endowment. During the latter half of the spring 2020 semester, Middlebury spent $46,430 in new technology, $39,157 in personal protective equipment, and $58,890 in caring for isolated and quarantined students.

A Student Emergency Fund provided by Middlebury helped students meet costs for daily needs such as moving, travel, food, and technology. During the spring 2020 semester, Plaintiff did not request any additional financial aid or assistance from Middlebury as a result of the transition to remote learning. He, however, received a laptop from Middlebury, which was paid for by the Student Emergency Fund, after his laptop broke.

Middlebury ensured its students were able to remain in their work-study jobs so they could continue to receive benefits associated with that employment. Plaintiff worked as a remote grader for two computer science classes and was paid for his work. To meet these additional costs, Middlebury's senior administration took a voluntary pay cut.

### C.    Plaintiff's Spring 2020 Semester.

In the spring of 2020, Plaintiff was enrolled in four classes, one of which included a lab component. After the transition to remote learning in March 2020, Plaintiff

4

continued to receive instruction in all four courses. During this time, Plaintiff had access to his professors through office hours and other one-on-one interactions. At the end of the semester, Plaintiff received grades in two of the four classes. He elected a credit/no-credit option for the other two so that he could achieve a higher grade point average. He received full credit for all the classes he took during the spring 2020 semester and earned a 4.0 term GPA.

### D.   The Student Activity Fee.

Students at Middlebury are required to pay a comprehensive fee, which covers tuition, room, and board, in addition to a Student Activity Fee ("SAF"). For spring 2020, Plaintiff was charged $27,895 in tuition, $8,016 for room and board, and a $213 SAF. Plaintiff received a Middlebury Grant for $10,079, an unsubsidized Federal Direct Loan for $3,711, and a College Loan Fund award for $2,750. Plaintiff was responsible for the remainder of his comprehensive fee, totaling $16,392.38, which he paid on July 30, 2020.

The SAF is assessed as a part of the comprehensive fee paid by students each semester. Each academic year, the student-run Student Government Association ("SGA") recommends an amount for the fee and Middlebury's administration approves it.

Middlebury sets aside the full amount of the SAF attributable to each student, meaning the SGA receives the amount assessed multiplied by the number of students enrolled. The SGA manages the disbursement of revenues from the SAF to student organizations. These revenues are used exclusively to fund Middlebury's student-led organizations.

Once the SGA distributes the funds in accordance with requests from the various student organizations, any unspent revenues are held in reserve and rolled over at the end of every semester. In March 2020, the SGA distributed all requested funding for the semester and held $326,611 in reserves. In response to the COVID-19 pandemic, the SGA voted to disburse $300,000 of its reserve funds to the emergency relief funds established by Middlebury. The remainder of the reserves was used to fund remote student organization activities.

Plaintiff identifies the following statements which he contends establish a
contractual obligation to provide student activities in-person and on Middlebury's
campus:

- Plaintiff's acceptance letter, stating: "[W]e will learn and grow together[,]"
  and "We look forward to welcoming you to campus[.]" (Doc. 101-2 at 2.)

- Middlebury's 2019-2020 Course Catalog course descriptions that reference
  "hands-on training, experience, or work." (Doc 101-3.)

- Middlebury's Student Handbook, referencing "campus" programming.
  (Doc. 101 at ¶ 14.)

- Promotional emails containing photos of campus and facilities and referring
  to "campus life" and an "environment that is naturally beautiful[.]" (Doc.
  94-21 at 18, Doc. 101-4 at 2.)

- Middlebury's promotional booklet discussing "dozens of clubs, groups,
  organizations, and opportunities[]" and the "greater campus community[,]"
  which includes photos of campus facilities. (Doc. 101-5 at 22, 30.)

- A March 2019 press release stating the "mandatory student activity fee will
  increase by $8 to $426." Middlebury's president stated the increase was
  necessary to "maintain the quality of the student experience as well as our
  commitment to making Middlebury accessible to a diverse group of
  talented and bright students whom we want to continue to attract to our
  campus." (Doc. 101-7 at 2) (internal quotation marks omitted).

- Middlebury's admissions website which contains the following statements:
  "[W]e . . . create opportunities for all students to participate in critical
  engagement and thoughtful collaboration as a community[]"; "[W]e create
  a diverse campus community[]"; and "Middlebury students are engaged,
  globally literate, and socially conscious, pursuing the passions that drive
  them to know more." (Doc. 101 at 36-37, ¶ 18) (second alteration in
  original) (internal quotation marks omitted).

- Middlebury's website promoting "Annual Campus Events[.]" (Doc. 101-8
  at 2.)

- The Middlebury College Campus Master Plan acknowledging "the
  'fundamental and elusive' linkage between the physical form of the campus

and [Middlebury's] academic mission and strategic goals." (Doc. 101-9 at 4.)

### III.   Disputed Facts.

#### A.   Whether Middlebury Was Unjustly Enriched as a Result of the COVID-19 Pandemic.

Middlebury states it lost significant revenue as a result of the COVID-19 pandemic: $9.48 million in room and board refunds and $1.5 million in canceled events. It provides evidence that the cumulative impact of the COVID-19 pandemic was $53,892,099 in unanticipated expenditures, as a result of spending for student aid, upgraded technology, restructured dormitories, and other COVID-19-related costs. During the 2019-2020 academic year, it collected $157,502,000 in net revenues from the comprehensive fee, spent $277,403,000 educating students, and awarded $74,184,000 in financial aid. Although comprehensive fees covered approximately 56.8% of the cost of educating students, the remainder of this expense was paid using withdrawals from Middlebury's endowment, as well as through gifts and contributions, sponsored activities, and other sources such as campus retail operations. It contends its 2020 revenue was at least $10,981,540 less than anticipated and that the overall net impact was a loss of $10,194,969 after receiving grants related to COVID-19.

Plaintiff disputes Middlebury's computations with expert witness testimony opining that students paid more in tuition and fees than Middlebury spent on educational instruction during the spring 2020 semester and that "Middlebury's margin of tuition and fees (net of financial aid) after deduction of instruction expenses was 36.77%." (Doc. 101 at 33, ¶ 1.) Plaintiff contends Middlebury's expenses were further offset by a decrease in operational expenses.[2]

#### B.   Use of the SAF.

Middlebury asserts the SAF "is *not* paid in exchange for any specific services provided by" Middlebury, nor is it assessed "in exchange for access to campus facilities"

---

[2] Middlebury argues Plaintiff's expert witness's opinion is conclusory and is thus inadmissible speculation. It does not, however, move to exclude that opinion.

or to fund "the upkeep of any facility on campus." (Doc. 94-1 at 19) (emphasis in original). If students are dissatisfied with how the SAF revenues are allocated, their only recourse is to vote for different SGA members.

Plaintiff disagrees, arguing Middlebury could have refunded the SAF fee to students, citing the deposition testimony of David J. Provost, who stated that the administration could not have refunded the SAF from the SAF revenue funds because those are controlled by the SGA, but that the administration could have refunded the SAF from another source.

## IV.     Conclusions of Law and Analysis.

### A.     Standard of Review.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his [or her] favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman*

8

*v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, not all disputes of fact are material—"[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). Accepting the nonmoving party's version of the disputed facts as true, summary judgment may be granted if the moving party remains entitled to judgment as a matter of law in its favor.

> Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.

*Alice Peck Day Mem'l Hosp. v. Samuelson*, 678 F. Supp. 3d 542, 553 (D. Vt. 2023) (quoting *Anderson*, 477 U.S. at 248).

Summary judgment may also be granted if no rational fact finder could find in favor of the moving party even if the moving party's version of the facts is adopted, *Wilson v. Glenro*, 2012 WL 1005007, at *5 (D. Vt. Mar. 23, 2012), *aff'd*, 524 F. App'x 739 (2d Cir. 2013); *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993) ("There is no material fact issue . . . when reasonable minds cannot differ as to the import of the evidence before the court."), or if the plaintiff fails to establish the essential elements of a claim with regard to which it will have the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

The court's jurisdiction over this case is based upon diversity of citizenship. As a result, the court analyzes Plaintiff's claims in accordance with Vermont law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

### B.      Breach of Contract Claim Based on the SAF.

Middlebury contends it is entitled to summary judgment on Plaintiff's breach of contract claim because Plaintiff has failed to identify a specific and concrete promise to hold in-person activities on-campus during the spring 2020 semester in exchange for the SAF. Plaintiff responds that he has identified a number of statements by Middlebury that gave him a "reasonable expectation" that student activities would be held in-person and on-campus notwithstanding a pandemic. (Doc. 101 at 13) If Middlebury could not provide this experience, Plaintiff contends it was contractually required to refund the SAF to Plaintiff and other students.

To state a breach of contract claim under Vermont law, Plaintiff must establish (1) the existence of a contract, (2) breach of the contract, and (3) damages. *See Lapoint v. Dumont Constr. Co.*, 258 A.2d 570, 571 (Vt. 1969). A contract may be express or implied in fact,[3] the difference being "only in the mode of proof." *Peters v. Poro's Est.*, 117 A. 244, 246 (Vt. 1922). An implied-in-fact contract is "inferred from the circumstances, the conduct, acts, or relation of the parties, rather than from their spoken words." *Id.* at 247.

"The Vermont Supreme Court has recognized that the relationship between a student and his or her college is 'contractual' in nature." *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 708 (D. Vt. 2012) (citing *Reynolds v. Sterling Coll., Inc.*, 750 A.2d 1020, 1022 (Vt. 2000)); *see also Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987) (holding that "[b]etween a student and a college there is a relationship which is contractual in nature").

### 1.      Whether an Implied Contract is Created by Plaintiff's Reasonable Expectations.

Plaintiff's breach of contract arguments are premised upon a claim that Vermont law allows a contract to be created between a university and a student based upon the

---

[3] A contract implied in fact is different from a contract implied in law. *See Morse v. Kenney*, 89 A. 865, 866 (Vt. 1914) (explaining that agreement implied in fact exists "[w]here the minds of the parties meet and their meeting results in an unexpressed agreement[]" while an agreement implied in law requires "no meeting of the minds[]" and "is not a contract at all[]" but, instead, is imposed "upon equitable grounds").

student's reasonable expectations.[4] The only Vermont case Plaintiff cites in support of this contention is *Reynolds v. Sterling College, Inc.* There, the Vermont Supreme Court found that:

> [T]he tuition refund policy was a *specific and concrete term of the contract* between plaintiffs and defendant. Defendant recognized this by specifically requiring that plaintiffs agree to the terms of this policy on the registration form. Plaintiffs are entitled to enforce the tuition refund policy by this action for damages from defendant's alleged breach.

750 A.2d at 1022 (citing *Se. Flight Acad. v. Hazell*, 444 S.E. 2d 402, 404 (Ga. Ct. App. 1994)) (emphasis supplied). In so ruling, the *Reynolds* court noted that:

> The reasonable expectation of the student was that the power to raise tuition was extinguished once the student paid . . . . It is inconceivable that the University could retain carte blanche authority to raise the tuition at any time during the semester for any amount it deems appropriate.

*Id.* at 1023 (citing *Gamble v. Univ. Sys. of N.H.*, 610 A.2d 357, 361 (N.H. 1992)).

The *Reynolds* court did not disavow its holding that plaintiff was required to identify "a specific and concrete term of the contract between plaintiffs and defendant[,]" *id.* at 1022, nor did it endorse a "reasonable expectations" approach to contract interpretation. Since *Reynolds*, no Vermont court has held that a student's "reasonable expectations" will suffice. Plaintiff is thus incorrect that he "need only show that he had a reasonable expectation, based on Middlebury's catalogs, handbooks, academic policies, and other official publications," that Middlebury would provide students in-person, on-campus education and activities. (Doc. 101 at 13.) Under Vermont law, to avoid summary judgment, he must

---

[4] Plaintiff appears to rely on Massachusetts law, which differs from Vermont law in that when "reviewing a student's breach of contract claim against his or her university," Massachusetts courts employ "a reasonable expectations standard in interpreting the relevant contracts." *Shulse v. W. New England Univ.*, 2020 WL 4474274, at *9 (D. Mass. Aug. 4, 2020) (citing *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 80 (1st Cir. 2018) (internal quotation marks omitted)). This inquiry requires Massachusetts courts to ask "'what meaning the . . . university[] should reasonably expect the . . . student to give" the contract. *Id.* (alteration adopted) (quoting *Doe*, 892 F.3d at 80). "If the facts show that the university has 'failed to meet [the student's] reasonable expectations[,]' the university has committed a breach." *Id.* (internal quotation marks omitted) (quoting *Doe*, 892 F.3d at 80). Vermont law does not follow this approach.

instead identify a specific and concrete promise made by Middlebury to hold activities in-person and on-campus in exchange for the SAF.

> **2.      Whether Plaintiff Has Identified a Specific and Concrete Promise to Provide In-Person and On-Campus Education and Activities During the Spring 2020 Semester.**

"The terms of the [implied] contract" between a university and its students "are contained in the brochures, course offering bulletins, and other official statements, policies and publications of the institution." *Reynolds*, 750 A.2d at 1022 (internal quotation marks and citation omitted). "Not all terms in a student handbook are enforceable contractual obligations, however, and courts will only enforce terms that are 'specific and concrete.'" *Knelman*, 898 F. Supp. 2d at 709 (quoting *Reynolds*, 750 A.2d at 1022).

At the motion to dismiss stage, this court found that promises "to offer a 'vibrant campus culture' or a 'hub of student activity from morning to night, with students pursuing the passions that drive them to know more[,]'" were aspirational in nature and therefore unenforceable. *Mooers v. Middlebury Coll.*, 2022 WL 1719359, at *4 (D. Vt. May 27, 2022) (alteration in original). Rejecting similar claims as insufficient at the summary judgment phase, the Northern District of California explained:

> While this [c]ourt concluded at the motion to dismiss stage that Plaintiff had sufficiently alleged facts that *could* show a specific promise by Defendant to hold in-person instruction and services, at the summary judgment phase Plaintiff must provide evidence supporting his [or her] assertion that Defendant made express promises. Statements in the course catalog about the "days and times" and the "location" of courses are not express promises to provide in-person instruction. . . . Although [the university's] promotional materials and course catalogs certainly created an expectation that classes would be taught in-person and that students would be able to take advantage of a myriad of on-campus opportunities, these materials do not contain any specific or identifiable promise that is adequate to support a breach of contract, even one implied in fact . . . . Rather, the materials and publications merely describe [the university's] on-campus experience, which Plaintiff received until [the university] was required to respond to and comply with California state mandates as a result of the COVID-19 pandemic.

*Randall v. Univ. of the Pac.*, 2022 WL 1720085, at *6 (N.D. Cal. May 28, 2022) (internal citations omitted) (emphasis in original). Other district courts in the Second Circuit and elsewhere have reached the same conclusion.[5]

　　*Rynasko v. New York University*, on which Plaintiff heavily relies, is inapposite. There, a divided three-judge panel of the Second Circuit reversed the district court's dismissal of a breach of implied contract claim at the motion to dismiss stage on standing grounds. 63 F.4th 186, 197 (2d Cir. 2023). In so ruling, the majority observed in dicta that the terms of an implied contract were defined by NYU's course catalog, marketing materials, descriptions of its on-campus services and facilities, and NYU's past course of conduct, *id.* at 198, and found "a reasonable factfinder *could* conclude that [the plaintiff's] plausible allegations demonstrate an implied contract to provide in-person services." *Id.* (emphasis in original). The partial concurrence did not address this conclusion because it agreed

---

[5] *See, e.g.*, *Bergeron v. Rochester Inst. of Tech.*, 2023 WL 1767157, at *6-10 (W.D.N.Y. Feb. 3, 2023) (granting summary judgment on implied contract claim for student activity fees based on communications from the university, the use of the word "campus" in university materials, and the content of plaintiff's acceptance letter and other marketing communications because none of these "constitute a specifically designated, discrete promise that [the university] will provide an entire semester of on-campus, in-person instruction and experiences"); *Freeman v. New York Univ.*, 2022 WL 445778, at *2 (S.D.N.Y. Feb. 14, 2022) (observing that, in the Second Circuit, a breach of contract claim premised on vague references to materials that market the on-campus experience as a benefit of enrollment "are axiomatic of a failure to demonstrate" language identifying a promise of in-person instruction) (collecting cases); *Amable v. New Sch.*, 551 F. Supp. 3d 299, 308-16 (S.D.N.Y. 2021) (collecting cases and dismissing plaintiff's breach of contract claim based on statements made in the university's course catalog and schedule, its official attendance statement, and a promotional statement posted to the university's website because these materials did not contain a "specifically designated and discrete promise" to provide classes exclusively in-person) (internal quotation marks omitted); *Buschauer v. Columbia Coll. Chi.*, 2021 WL 1293829, at *5-6 (N.D. Ill. Apr. 6, 2021) (dismissing plaintiff's breach of contract claim for tuition and fees because the university's "catalogs, circulars, bulletins, and regulations[]" did not "support finding that [the university] made specific promises of on-campus, in-person instruction and services for the spring 2020 semester[]"); *In re: Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, 649 F. Supp. 3d 1245, 1250-53 (S.D. Fla. 2022) (granting summary judgment on breach of contract claim supported by content in "the University's website, recruitment brochures, and circulars, which promote the campus 'vibe' and facilities and experiences[,]" because such statements were insufficient to sustain plaintiffs' breach of contract claim).

with the majority's conclusion that the plaintiff lacked standing. *Id.* at 204 (Parker, J. concurring in part). It did, however, disagree with the majority's method of contract interpretation:

> The majority has no way of dealing with [the provision specifically allowing NYU to transition to remote learning] in the implied contract it purports to interpret and enforce except by claiming the language "must be understood as a single data point in the context of all the other factors shaping the contours of the implied contract between NYU and its students." With respect, this search for "data points," whatever and wherever they might be, is not a valid approach to contract interpretation under New York law. Basic principles of contract interpretation require us to read the contract "as a whole, with every part interpreted with reference to the whole." . . . Thus, all—not isolated, randomly selected—"data points" that make up the implied contract must be interpreted alongside of this prominent and specific provision which explicitly allows NYU to change the mode of instruction in its discretion. The majority's concerns about one-sided contracts cannot excuse a failure to respect and apply unambiguous contract language.

*Id.* at 208 (internal citations omitted).[6]

*Rynasko*, which analyzed New York law, does not dictate the outcome in this case. At the summary judgment stage, Plaintiff must proffer admissible evidence to support each essential element of his breach of contract claim under Vermont law. *See Kennedy v.*

---

[6] The partial concurrence's interpretation of New York contract law is consistent with *Keefe v. New York Law School*, the seminal case on that issue. There, the court held:

> Generally, New York State courts have permitted a student to bring a breach of implied contract action against an institution of higher education. However, a student must identify *specific language* in the school's bulletins, circulars, catalogues and handbooks which establishes the particular "contractual" right or obligation alleged by the student in order to make out an implied contract claim. *General statements of policy are not sufficient to create a contractual obligation. Only specific promises* that are material to the student's relationship with the school can establish the existence of an implied contract. To state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached those *specific promises*.

*Keefe v. N.Y. L. Sch.*, 2009 WL 3858679, at *1-2 (N.Y. Sup. Ct. Nov. 17, 2009), *aff'd*, 71 A.D. 3d 569, 897 N.Y.S.2d 94 (N.Y. App. Div. 2010) (internal citations and quotation marks omitted) (emphasis supplied).

*Hirsch*, 2023 WL 2564026, at *2 (2d Cir. Mar. 20, 2023) (noting "the fundamental difference between the standards that apply with respect to a motion to dismiss and those that apply to a motion for summary judgment").

In arguing that Middlebury has made a specific and concrete promise to provide in-person, on-campus activities in exchange for the SAF, Plaintiff continues to rely on promotional, generalized, and laudatory statements touting a "vibrant campus," an "environment that is naturally beautiful," "dozens of clubs, groups, organizations, and opportunities," "opportunities for all students to participate in critical engagement and thoughtful collaboration as a community[,]" a "diverse campus community," and statements of a similarly vague and aspirational nature. None of these statements is a specific and concrete promise that student activities will take place in-person and on-campus. The majority of courts, including this one, have recognized that aspirational statements are non-contractual in nature and cannot be enforced.[7] *See Knelman*, 898 F. Supp. 2d at 709 (granting summary judgment in favor of Middlebury because the plaintiff failed "to point to any 'specific and concrete term of the contract[]' which support[ed] his breach of contract claim").

Plaintiff cites three out-of-circuit district court cases which he contends support a different outcome. Those decisions are either distinguishable or unpersuasive.

In *Little v. Grand Canyon University*, "[t]he crux of the parties' dispute center[ed] on whether [the university] actually 'provided' housing, food, and services associated with the 'Other Fees'" charged. 2023 WL 5348566, at *2 (D. Ariz. Aug. 21, 2023). The court found a disputed issue of fact as to whether the university "breached its obligations associated with this fee" when it shut down some activities and facilities pursuant to an Executive Order requiring all bars, gyms, and movie theatres to close in certain areas. *Id.* at *4.

---

[7] The absence of a specific and concrete promise becomes even more apparent when considering enforcement. A reasonable fact finder could not determine whether a campus was sufficiently "vibrant," "naturally beautiful," "hands-on," "thoughtfully collaborative," or "diverse" without engaging in a values-laden, subjective inquiry for which courts and jurors are particularly ill-suited.

In *Arredondo v. University of La Verne*, 618 F. Supp. 3d 937 (C.D. Cal. 2022) and *In re Pepperdine University Tuition & Fees COVID-19 Refund Litigation*, 659 F. Supp. 3d 1086 (C.D. Cal. 2023), like the Massachusetts courts, the California "courts look[ed] to the parties' 'reasonable expectation' at the time of contracting to 'give effect to the mutual intention of the parties as it existed at the time the contract was executed.'" *In re Pepperdine Univ.*, 659 F. Supp. 3d at 1094 (quoting *Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 652 (2007)). "Reasonableness, in turn, depends on the definiteness and specificity of the promise in question." *Id.*; *see Arredondo*, 618 F. Supp. 3d at 946 (finding in-person offerings were "a term of the implied contract between on-campus students and [the university]" because, based on the university's publications, "any reasonable student would believe that a tuition deposit would confer in-person access to the [university] campus[]"). Vermont does not follow the "reasonable expectations" approach.

Finally, in *Staubus v. Regents of the University of Minnesota*, 2022 WL 17479430 (Minn. Dist. Ct. Dec. 1, 2022), a state trial court found "the University's marketing materials and internal regulations, its decision to refund all of some of certain Mandatory Fees, and its acknowledg[]ment that by accepting payment of the Mandatory Fees, it was required to provide students with something in exchange," created a triable issue of fact as to whether a contract existed between the parties. *Id.* at *7. In so finding, the court observed that "the existence of an implied contract is usually a question to be determined by the trier of fact as an inference of facts to be drawn from the conduct and statements of the parties." *Id.* (internal quotation marks and citation omitted). In rejecting the university's argument "that the materials cited by [p]laintiffs are no more than general laudatory or otherwise vague or indefinite statements that cannot create an implied contract under Minnesota law[,]" *id.* at *6, the court tacitly acknowledged a specific and concrete promise was a requirement of Minnesota law. *Staubus*, 2022 WL 17479430, at *6.[8]

---

[8] Minnesota law, like Vermont's, requires plaintiffs "bring[ing] an action against an educational institution for breach of contract" to establish that "the institution failed to perform on 'specific

16

In this case, the existence of an implied contract is uncontested. At the summary judgment stage, Plaintiff was required to establish a specific and concrete promise to hold activities on-campus and in-person. He has not done so. Having failed to satisfy the first prong of his breach of contract claim, summary judgment in Middlebury's favor must be granted. *See Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### 3.    Whether "the Lost Week" Constitutes a Breach of Contract.

Plaintiff asserts Middlebury did not provide *any* student activities during a portion of the semester he calls "the Lost Week" when, pursuant to the Governor of Vermont's Executive Order, Middlebury extended its spring break and sent its students home early. Plaintiff points out that Middlebury's promotional booklet discusses "dozens of clubs, groups, organizations, and opportunities[.]" (Doc. 101-5 at 22.) He contends that Middlebury was required to offer *some form* of student activities during the Lost Week, or remit 5.6% of the SAF. He cites no specific and concrete promise by Middlebury that student activities would take place every day of the semester without interruption. On that ground alone, his "Lost Week" claim must fail.

---

promises' it made to the student[.]" *Clem v. St. Mary's Univ. of Minn.*, 2010 WL 773596, at \*3 (Minn. Ct. App. Mar. 9, 2010); *see also Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 473 (Minn. Ct. App. 1999) ("adopt[ing ] the majority rule that a student may bring an action against an educational institution for breach of contract, fraud, or misrepresentation, if it is alleged that the institution failed to perform on specific promises it made to the student and the claim would not involve an inquiry into the nuances of educational processes and theories") (internal citations and quotation marks omitted); *Huson v. Benilde-St. Margaret's Sch.*, 2018 WL 4401726, at \*3 (Minn. Ct. App. Sept. 17, 2018) ("Failing to identify any terms that form a contract expressly, the [plaintiffs] instead offer general references to the handbook and ask us to infer contract-creating terms. . . . They cite language in the handbook laudably describing [the school's] general expressions of commitment to providing a positive educational environment [among other statements] . . . . We hold that the breach-of-contract claim fails as a matter of law because the [plaintiffs] failed to proffer any handbook language from which a jury might reasonably conclude that the school made an enforceable promise.").

17

To the extent Plaintiff claims that activities were required to take place in-person and on-campus during the Lost Week, any such promise would be unenforceable. "The law has long recognized that courts have the power to void even clear, unambiguous written contracts that contravene public policy in either their terms or contemplated performance." *Scott v. State*, 2021 VT 39, ¶ 22, 214 Vt. 616, 625, 256 A.3d 105, 112. Correspondingly, "[a] contract whose . . . performance is illegal may be held void and unenforceable[.]" *My Sister's Place v. City of Burlington*, 433 A.2d 275, 282 (Vt. 1981). "To invoke this power, however, the moving party must show that enforcement of the contract would be either 'cruel or shocking to the average person's conception of justice' or 'injurious to the public or against the public good.'" *Scott*, 2021 VT 39, ¶ 22, 214 Vt. at 625, 256 A.3d at 112 (alteration adopted) (quoting *Dutch Hill Inn, Inc. v. Patten*, 303 A.2d 811, 814 (Vt. 1973)).

Assuming arguendo that Middlebury and Plaintiff entered into a binding contract requiring student activities to take place in-person and on-campus notwithstanding a pandemic, no rational court or jury could conclude performance of such a contract was consistent with public policy or, conversely, could fail to find the performance of such contract "injurious to the public [and] against the public good." *Id.* (internal quotation marks omitted).

On March 13, 2020, Middlebury shut down and sent its students home in the wake of a global pandemic and pursuant to an Executive Order that indicated its terms were mandatory.[9] To hold student activities in-person and on-campus would have encouraged the spread of a deadly and rapidly proliferating virus. It would have endangered lives and human health. It would have embroiled Middlebury in a dispute regarding how best to respond to and contain a pandemic. Under Vermont law, such a contract, if it existed,

---

[9] "WHEREAS, if no mitigation steps are taken, COVID-19 would likely spread in Vermont at a rate similar to the rate of spread in other states and countries, and the number of persons requiring medical care could exceed locally available resources . . . . IT IS HEREBY ORDERED . . . To help preserve and maintain public health, I hereby prohibit all large non-essential mass gatherings of more than 250 people in a single room or single space at the same time for social and recreational activities[.]" Exec. Order No. 01-20 (emphasis omitted).

18

would be void and unenforceable. *LoPresti v. Rutland Reg'l Health Servs., Inc.*, 2004 VT 105, ¶ 19, 177 Vt. 316, 325, 865 A.2d 1102, 1110 ("Vermont law has long held that courts have the power to void written contract provisions that violate public policy in either their terms or contemplated performance.").

Because Plaintiff fails to identify a specific, enforceable promise to provide uninterrupted student activities during the Lost Week, and because any such promise to do so in-person and on-campus would be unenforceable, Middlebury's motion for summary judgment regarding Plaintiff's "Lost Week" claim is GRANTED.

### C.    Whether Plaintiff Ratified Middlebury's Performance by Paying the SAF.

Middlebury argues that, *even if* Plaintiff could establish an enforceable implied contract, his acceptance of Middlebury's substitute performance through his payment of the SAF without protest or condition constitutes a ratification. Plaintiff argues that Middlebury's ratification defense fails because Plaintiff had no other choice but to pay his tuition and fees to continue his education.

"[R]atification is a waiver of existing rights," *Lincoln Nat'l Life Ins. Co. v. Inzlicht-Sprei*, 2020 WL 1536346, at *12 (E.D.N.Y. Mar. 31, 2020) (citation and internal quotations omitted), and occurs through "a party's affirmance of an *earlier* act that did not bind it at the time[.]" *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 23 (2d Cir. 2017) (summary order) (emphasis in original). It is an affirmative defense for which Middlebury has the burden of proof. *See Russo v. Navient Sols., LLC*, 2018 WL 1474354, at *17 (D. Vt. Mar. 23, 2018) (stating "[d]efendants bear the burden of proof" when asserting the affirmative defense of ratification) (citing *Adams v. Barcomb*, 216 A.2d 648, 650 (Vt. 1966)). Whether a party has ratified an agreement may be a question of law or fact. *See id.* (finding ratification as a matter of law because defendants carried their burden, even though "[p]laintiff argues that ratification is a question of fact"). "Failure to object within a reasonable time and accepting the benefits of an agreement is evidence of ratification." *Id.* at 16 (citing *Lakeside Equip. Corp. v. Town of Chester*, 795 A.2d 1174, 1181 (Vt. 2002); *Boston & M.R.R. v. Howard*

*Hardware Co.*, 186 A.2d 184, 187 (Vt. 1962); *Manchester Marble Co. v. Rutland R. Co.*, 136 A. 394 (Vt. 1927)).

In this case, Middlebury has established that Plaintiff tendered payment of the SAF on July 30, 2020, *after* the spring 2020 semester concluded. At that time, it is undisputed that Plaintiff was aware that no student activities had been held in-person or on-campus and that activities were not held remotely during the Lost Week. Accepting the benefits of substitute events, Plaintiff paid the SAF without protest or condition. Because Middlebury has prevailed on Plaintiff's breach of contract claim, the court need not and does not address whether Middlebury has established its affirmative defense of ratification.

### D.     Whether Middlebury is Entitled to Summary Judgment on Plaintiff's Unjust Enrichment Claims.

Plaintiff seeks to recover the amounts he paid for tuition and the SAF for the spring 2020 semester to the extent Middlebury was unjustly enriched by such payments. He contends there is a genuine issue of material fact regarding his unjust enrichment claims. In the alternative, Plaintiff contends that the issue of unjust enrichment cannot be resolved because he "has requested, but not yet received[,] complete production of documents and information detailing specifically how the student tuition fees Middlebury collected during the Spring 2020 semester were spent and how they were categorized[.]" (Doc. 101 at 22.)

### 1.     Whether Plaintiff is Entitled to Delay Summary Judgment on His Unjust Enrichment Claim.

"Fed. R. Civ. P. 56(d) provides that when 'a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may' defer consideration of the motion [or] deny the motion[.]" *S.R.J.F., Inc. v. Dairy Farmers of Am.*, 2023 WL 6246481, at *15 (D. Vt. Sept. 26, 2023). "A party seeking discovery in response to a motion for summary judgment bears the burden to state in an affidavit '1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and 2) how those facts are reasonably

20

expected to create a genuine issue of material fact; and 3) what efforts the affiant has made to obtain those facts; and 4) why those efforts were unsuccessful.'" *Id.* (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir. 1985)). Plaintiff has not filed an affidavit to support his Rule 56(f) request. Accordingly, he cannot avoid summary judgment on this basis.

## 2. Whether Plaintiff Has Established His Unjust Enrichment Claim.

Under Vermont law, unjust enrichment requires a plaintiff to establish that "(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." *Reed v. Zurn*, 2010 VT 14, ¶ 11, 187 Vt. 613, 616, 992 A.2d 1061, 1066 (internal quotation marks omitted). A claim for unjust enrichment arises only "in the absence of any agreement[,]" and "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery . . . for events arising out of the same subject matter." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006) (internal quotation marks and emphasis omitted); *see also Goldberg v. Saint-Sauveur Valley Resorts, Inc.*, 2018 WL 8370060, at *18 (D. Vt. Dec. 20, 2018) (same) (citing *Beth Israel Med. Ctr.*, 448 F.3d at 586-87); *Beldock v. VWSD, LLC*, 2023 VT 35, ¶ 75, 307 A.3d 209, 235-36 ("[A]n unjust-enrichment claim cannot be maintained where a valid, enforceable contract between the parties exists.").[10]

Although the doctrine of unjust enrichment will not "rescue a party from the consequences of a bad bargain[,]" it permits a court to "impose a remedy to further the ends of justice[]" where "an express contract does not fully address a subject" or is

---

[10] Unjust enrichment is an equitable claim available only when there is no adequate remedy at law. *See Poulin v. Town of Danville*, 260 A.2d 208, 211 (Vt. 1969) ("Equity will afford relief unless there is a plain, adequate and complete remedy at law.") (citing *Gerety v. Poitras*, 224 A.2d 919, 921 (Vt. 1966)); *In re C.B.*, 518 A.2d 366, 381 (Vt. 1986) ("[T]o be adequate[,] the remedy at law must be 'practical and as efficient to the ends of justice and its prompt administration as the remedy in equity.'") (internal quotations omitted) (quoting *Poulin*, 260 A.2d at 211).

21

"otherwise ineffective to regulate the parties' obligations." *Id.* ¶ 77-78, 307 A.3d at 236 (internal quotation marks and citations omitted). "'A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.'" *Beldock*, 2023 VT 35, ¶ 76, 307 A.3d at 236 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2(2)).

Vermont law does not authorize a court to make a better bargain for the parties than they have made for themselves through the doctrine of unjust enrichment. *See Whitney v. Vt. Mut. Ins. Co.*, 2015 VT 140, ¶ 16, 201 Vt. 29, 35, 135 A.3d 272, 277 ("No court may rewrite unambiguous contractual terms to grant one party a better bargain than the one it made.") (internal quotations omitted) (citing *Vt. Mut. Ins. Co. v. Parsons Hill P'ship*, 2010 VT 44, ¶ 28, 188 Vt. 80, 93, 1 A.3d 1016, 1025). Equity also does not allow a court to fill gaps in the parties' existing agreement. *See Michel v. Yale Univ.,* 110 F.4th 551, 560-61 (2d Cir. 2024) (affirming summary judgment in favor of the university on plaintiff's unjust enrichment claim because "[plaintiff's] contractual relationship with [the university], including the Temporary Suspension Provision, limits his ability to raise . . . unjust enrichment claims").

It is undisputed that a valid contract existed between Middlebury and Plaintiff. Because it did not require an in-person, on-campus education or student activities, or student activities during the Lost Week, the court cannot supply those missing contract terms through the doctrine of unjust enrichment. *See Rynasko*, 63 F.4th at 202 (noting at the motion to dismiss stage, a plaintiff may plead in the alternative, however, "to the extent that any implied contract between NYU and [the plaintiff] is enforceable, [the plaintiff] could not also recover damages in unjust enrichment"); *Tapinekis v. Pace Univ.*, 2024 WL 2764146, at *2 (2d Cir. May 30, 2024) (stating unjust enrichment claims were properly dismissed because the university "does not dispute the existence of an implied contract between itself and [the plaintiff]; it only disputes the terms of that implied contract[,]" making plaintiff's unjust enrichment claims "entirely duplicative of her breach of contract claims[]") (alteration adopted).

Because there is no issue of material fact regarding the existence of an implied contract between the parties under Vermont law, Middlebury's motion for summary judgment on Plaintiff's tuition and SAF unjust enrichment claims must be GRANTED.

### E.   Jury Demand for Unjust Enrichment Claim

Middlebury requests the court strike Plaintiff's jury demand with respect to his unjust enrichment claims because he is not entitled to a jury determination of an equitable remedy. The court addresses this claim solely for appellate review.

The Seventh Amendment to the Constitution protects the right to a jury trial in "suits in which *legal* rights are to be ascertained and determined, in contradistinction to those where equitable rights alone are recognized, and equitable remedies are administered." *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 564 (1990) (emphasis in original) (alterations adopted). The Vermont Constitution contains the same guarantee. *See State v. Irving Oil Corp.*, 2008 VT 42, ¶ 5, 183 Vt. 386, 391, 955 A.2d 1098, 1101 (stating the right to a jury trial attaches to "[c]laims traditionally tried in a 'court of law'" as distinguished from claims "that are 'equitable' in nature, which were traditionally tried solely before a judge and therefore fall outside the scope of the right[]"). Claims for unjust enrichment are treated as equitable in nature. *See Ehlers v. Ben & Jerry's Homemade Inc.*, 2020 WL 2218858, at *9 (D. Vt. May 7, 2020) (characterizing unjust enrichment claims as equitable remedies); *Legault v. Legault*, 459 A.2d 980, 984 (Vt. 1983) (same).

A jury trial is not available for Plaintiff's unjust enrichment claim under Vermont law. Vt. R. Civ. P. 39(d) governs how state courts address mixed claims at law and at equity. The court need not resolve how it would proceed at trial because Plaintiff's claims at law and in equity have been dismissed.

For the reasons stated above, Middlebury's motion to strike Plaintiff's jury demand is DENIED AS MOOT.

## CONCLUSION

The court GRANTS the Middlebury's motion for summary judgment and DENIES AS MOOT Middlebury's motion to strike Plaintiff's jury demand. (Doc. 94.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __17th__ day of October, 2024.

Christina Reiss, Chief District Judge
United States District Court